# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATHRYIN SACK,<br><br>        Plaintiff,<br><br>        v.<br><br>DEPARTMENT OF JUSTICE,<br><br>        Defendant. | Case No. 1:12-cv-01755 (CRC) |

## MEMORANDUM OPINION

Plaintiff Kathryn Sack seeks to compel four Department of Justice ("DOJ") components to conduct additional searches and produce withheld records in response to her FOIA requests for information on polygraph bias. The DOJ has moved for summary judgment, arguing that it conducted adequate searches and properly withheld records under FOIA Exemptions 2, 5, 6, and 7. Sack limits her opposition to challenging the adequacy of the DOJ's search for records regarding a Department of Defense polygraph institute, to which it repeatedly directed Sack, and its withholding of certain records regarding the ATF's administration of polygraphs to prospective special agents. Because the DOJ has not demonstrated that it conducted an adequate search for these particular records and has improperly invoked Exemptions 2 and 5, the Court will deny the government's motion in part.

    **I.**     **Background**

Kathryn Sack is a University of Virginia PhD student studying bias in polygraph examinations. Compl. ¶ 4. Sack submitted six requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records from the Federal Bureau of Investigations ("FBI") regarding polygraph bias and FBI polygraphers between 2009 and 2011, as well as a request to the Office of Personnel Management ("OPM"), which referred the request to the Bureau of Alcohol, Tobacco,

and Firearms ("ATF") and the Justice Management Division. Id. ¶¶ 7–62. She brings this action to compel the FBI and ATF to conduct additional searches and provide withheld documents that respond to these requests. Sack has declined to challenge the DOJ's motion for summary judgment as to some of her requests, Opp. to Mot. for Summ. J. at 2, and thus the Court will limit its recitation of the facts as to those requests.

Sack submitted her first request in December 2009, seeking "information on polygraph bias that is illegal under equal employment law" from the FBI. Declaration of David M. Hardy, Section Chief, Record/Information Dissemination Section, FBI Records Management Division ("Hardy Decl.") ¶ 1 & Ex. A. Two years later, Sack submitted four more requests through counsel. Compl. ¶ 22. The first asked for documents regarding: (1) research on bias in polygraph examinations; (2) incentive systems for polygraphers to "obtain confessions"; (3) the job description of polygrapher at the FBI; and (4) studies on sensitivity and accuracy rates of polygraphy. Hardy Decl. Ex. K. The second requested research and records on: (1) the Department of Defense Polygraph Institute or the Defense Academy of Credibility Assessment; (2) studies on discriminatory bias in polygraphy, including by the specific researchers Gordon Barland and Sheila Reed; (3) raw data and aggregate analysis of bias in polygraphy; and (4) aggregate data on polygraph examinations generally. Id. Ex. S. The third solicited records from the FBI's Security Division on: (1) the applicability of equal employment opportunity ("EEO") rules to the security clearance process for job applicants; (2) polygraphs within the FBI's EEO office; and (3) restrictions on the use of polygraphs. Id. Ex AA. She also requested communications between FBI employees and consultants and Sheila Reed, a well-known polygrapher. Id. Ex. F. Then, in December 2011, Sack sent her final request to the FBI for: (1) records on training agents to qualify as polygraphers; (2) the FBI Polygraph Unit's Policy Implementation Guide; and (3) any complaints to the FBI's EEO office alleging discrimination in the security clearance process for job applicants. Id. Ex. II. In October 2011,

Sack also sent a letter to OPM, which was forwarded to ATF, requesting: (1) reviews of federal agencies that conduct polygraphs; (2) records on why an agency might be excluded from OPM review; and (3) "interagency Memoranda of Agreement regarding polygraphs." Declaration of Stephanie M. Boucher, Chief, Disclosure Division ATF ("Boucher Decl.") Ex. A, B.

The FBI, through the declaration of David Hardy, states that it responded to Sack's requests by searching its central records system, intranet, investigative manuals, and nine offices or divisions of the Agency. Hardy Decl. ¶ 61. FBI personnel searched the central records system "in an effort to locate records indexed under 'polygraph bias,' 'Sheila Reed,' and 'Gordon Barland'" but uncovered no records in response to any of Sack's requests. Id. ¶ 62. The files of the Security Division and its Polygraph Unit "were searched no less than six times throughout the processing of [Sack's] requests . . . and located 133 pages of responsive records." Id. ¶ 63. Hardy explains that the "Chief of the Polygraph Unit/Supervisory Special Agent is familiar with the types of records maintained by the unit" and that he tasked the Polygraph unit employees to "conduct searches of hard copy and electronic records" for materials responsive to Sack's various requests. Id. ¶¶ 64–66. Likewise, the Chief of the Behavior Sciences Unit "checked the list of current research projects for BSU . . . . canvassed employees . . . . [and tasked employees] with searching their files . . . for any correspondence or e-mails involving Sheila Reed." Id. ¶ 68. Similarly, Laboratory Division employees were asked about whether the division had ever done polygraph research and directed to search for correspondence with Sheila Reed. Id. ¶ 69. In the Mobile Field Office, several employees involved in the polygraph program "reviewed the [hard-copy and electronic files maintained by the field office regarding polygraphs] and advised that the office does not maintain any records responsive to plaintiff's requests[.]" Id. ¶ 70. Employees of the Birmingham Field Office did the same. Id. ¶ 71. Employees reviewed the FBI's intranet using the terms "polygraph" and "polygraph bias" and discovered chapters of security policy manuals, which were deemed

responsive. Id. ¶ 72. Similarly, the Office of Equal Employment Opportunity Affairs ran searches of its database for the term "polygraph." Id. ¶ 73.

ATF, through the declaration of Stephanie Boucher, states that it was referred several documents that OPM marked as responsive and determined that some should be withheld in part under FOIA Exemptions 2, 5, 6, and 7. Boucher Decl. ¶ 5–6. Among other things, AFT withheld portions of AFT Order 2123.1, which outlines a "Pre-Employment Polygraph Special Agent Screening Program," and an inter-agency email from September 2010 that "provides a clarifying interpretation" of Order 2123.1. Id. ¶ 10. It withheld portions of the order and email under Exemption 2 because it determined these documents solely related to internal personnel matters and were not the subject of genuine and significant public interest. Id. ¶ 10–15. Under Exemption 5, AFT withheld the email as pre-decisional because it interpreted the order for OPM, which was deciding whether to re-approve it for the following year. Id. ¶¶ 18–23. Under Exemption 7(E), ATF withheld portions of the two documents because it "believes that background investigations . . . conducted to assess an applicant's qualification for a special agent position . . . inherently relate to law enforcement" and that revealing the withheld information would "assist applicants to manipulate or circumvent ATF's polygraph procedures[.]" Id. ¶¶ 43–46.

## II.  Legal Standard

Summary Judgment is appropriate when the pleadings, affidavits, exhibits, and other evidence before the Court demonstrate that there is no genuine issue of material fact in dispute, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant has the burden to demonstrate that there are no issues of material fact in dispute that may affect the outcome of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must accept all evidence of the non-movant and draw all reasonable inferences in the non-movant's favor. Id. at 255.

FOIA cases such as this are typically decided on motions for summary judgment. E.g., Shapiro v. DOJ, 969 F. Supp. 2d 18, 26 (D.D.C. 2013), appeal dismissed, 13-5345, 2014 WL 1378748 (D.C. Cir. Feb. 26, 2014) (citing Brayton v. Office of the U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011)). In order to meet its FOIA obligations and prevail on a motion for summary judgment the government must demonstrate that it conducted an adequate search and produced all responsive records not properly withheld under FOIA's nine statutory exemptions. Weisberg v. DOJ, 627 F.2d 365, 368 (D.C. Cir. 1980).

The government may satisfy this burden through affidavits setting forth in reasonable specificity its search methods and the justifications for its withholdings. Consumer Fed'n of Am. v. Dep't of Agric., 455 F.3d 283, 287 (D.C. Cir. 2006). The government cannot satisfy its burden with affidavits that are vague or conclusory, or merely parrot the statutory standard. Id. An agency affidavit will be afforded "substantial weight[] so long as it . . . is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith[.]" Judicial Watch, Inc. v. DOD, 715 F.3d 937, 940–41 (D.C. Cir. 2013) (quotation omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" Wolf v. CIA, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting Gardels v. CIA, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). Plausible, non-conclusory government affidavits "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" Safecard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

**III. Analysis**

A. Adequacy of Search

To meet its FOIA obligations, an agency must show that it "conducted a search reasonably calculated to uncover all relevant documents." Weisberg v. DOJ, 705 F.2d 1344, 1351 (D.C. Cir.

1983). The agency is not required to prove that it discovered every possibly relevant document, id. at 1485, but must demonstrate "a good faith effort[.]" Oglesby v. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990). The Court will judge the adequacy of an agency's search for documents by a standard of reasonableness that "depends, not surprisingly, upon the facts of each case." Weisberg, 705 F.2d at 1485.

The Court may grant summary judgment on the basis of agency affidavits and declarations alone when they are "relatively detailed and non-conclusory." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991). The affidavits need not "set forth with meticulous documentation the details of an epic search for the requested records[.]" Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982). But they must describe "what records were searched, by whom, and through what processes," Steinberg v. DOJ, 23 F.3d 548, 551–52 (D.C. Cir. 2008) (citing Weisberg, 627 F.2d at 37), and should "set[] forth the search terms and the type of search performed and aver[] that all files likely to contain responsive materials . . . were searched." Ogelsby, 920 F.2d at 68. There is a presumption of good faith accorded to agency submitted affidavits or declarations, "which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., 926 F.2d at 1200 (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

Sack specifically challenges the government's response to her request to the FBI for "records pertaining to the Department of Defense Polygraph Institute ("DoDPI") or the Defense Academy [for] Credibility Assessment ("DACA")[,]" which is now known as the National Center for Credibility Assessment ("NCCA"). Opp. to Mot. for Summ J. at 5. She expresses incredulity at the lack of records the FBI produced regarding this entity because the FBI encouraged Sack to contact NCCA regarding her requests no fewer than five times, Hardy Decl. ¶¶ 9, 29, 63, 70, 71,

and because all FBI polygraphers apparently receive training at NCCA. Opp. to Mot. for Summ. J. at 5–6.

The government is correct that a FOIA plaintiff cannot succeed in challenging the adequacy of the government's search by hypothesizing that additional records should have been discovered, e.g. Wilbur v. CIA, 355 F.2d 675, 678 (D.C. Cir. 2004), but this does not end the matter. It remains the government's burden to provide affidavits demonstrating that it conducted an adequate search, Weisberg, 705 F.2d at 1344. The Court concludes it has failed to do so here.

Perhaps because of the multitude of requests Sack submitted, the government omits key details from its descriptions of its searches regarding Sack's DACA request. For instance, Mr. Hardy states that the FBI searched its central record systems for the terms "polygraph bias," "Sheila Reed," and "Gordon Barland," but does not indicate whether it conducted any searches regarding DACA or NCCA. Hardy Decl. ¶ 62. Similarly, no term searches for DACA or NCCA appear to have been performed on the FBI intranet. See id. ¶ 72. Hardy states that the Polygraph Unit was "asked to search several times for records related to polygraph research, including . . . research and records pertaining to [DACA] and that "the few employees in the unit conducted searches of hardcopy and electronic records for polygraph research materials[.]" Id. ¶ 64. While Hardy's affidavit is otherwise comprehensive, it does not indicate whether the agency searched specifically for records regarding DACA. Nor does it reveal whether employees searched all hardcopy records or only a selection, or what terms they used to search electronic records. As a result, the government has not adequately described the process by which it searched for records regarding DACA, including "the search terms and the type of search performed[.]" Ogelsby, 920 F.2d at 68.

Additionally, the government's description of its search indicates it may have misconstrued Sack's request. While she asked for records pertaining to DACA broadly, the FBI appears only to have searched for records pertaining to polygraph bias, which would have excluded records

7

regarding DACA that were unrelated to bias research. This contravenes the government's "'duty to construe a FOIA request liberally.'" People for the Ethical Treatment of Animals v. Dep't of Health and Human Servs., 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting Nat'l Magazine v. U.S. Customs Serv., 71 F.3d 885, 890 (D.C. Cir. 1995)).

In sum, the Hardy declaration does not describe any searches specific to Sack's DACA request, or outline the FBI's general search process in such a way that might lead to a reasonable inference that the Bureau responded specifically to this request. Accordingly, the Court will deny the government's motion for summary judgment as to Count 3 and require the government to submit further affidavits or conduct additional searches to respond to Sack's request for records pertaining to DACA/NCCA.

B. Withholding of ATF Order 2123.1 and Email to OMB

As noted above, Sack challenges the ATF's withholding of portions of ATF Order 2123.1, which describes its "Pre-Employment Polygraph Special Agent Screening Program," and a "portion of an int[er]-agency email from ATF to OPM . . . which quotes a provision in ATF Order 2123.1 and offers a clarifying interpretation of that provision." Boucher Decl. ¶ 10. ATF has withheld Order 2123.1 under Exemptions 2 and 7(E). It has withheld the email to OPM under Exemptions 2, 5, and 7(E). The Court will review each justification for these withholdings.

i. Exemption 2

Exemption 2 protects from disclosure documents that are "related solely to the internal personnel rules and practices of an agency," 5 U.S.C. § 552(b), and are not the subject of "genuine and significant public interest." Dep't of the Air Force v. Rose, 425 U.S. 352, 369 (1976). The purpose of the exemption "is simply to relieve agencies of the burden of assembling and maintaining [such information] for public inspection." Id. The Supreme Court has recently held that "only records relating to issues of employee relations and human resources" are covered by the

exemption and emphasized that the "practice of 'construing FOIA exemptions narrowly' stands on especially firm footing with respect to Exemption 2." Milner v. Dep't of the Navy, 131 S. Ct. 1259, 1265–66, 1271 (2011) (internal citation omitted) (quoting DOJ v. Landano, 508 U.S. 165, 181 (1993)).

Sack acknowledges that Order 2123.1 and the email to OMB relate to the personnel functions of ATF, but argues that ATF's use of polygraphs on applicants for special agent positions is the subject of non-trivial and genuine public interest. Opp. to Mot. for Summ. J. at 7–8. The government responds that information for which there is a "genuine and significant public interest" is a narrower category than simply non-trivial information. Reply in Supp. of Mot. for Summ. J. at 9.[1] But the DOJ's proposed interpretation of the "public interest" standard conflicts with opinions of this Circuit, which have explained that "genuine public interest" means non-trivial information. Founding Church of Scientology of Washington, D.C., Inc. v. Smith, 721 F.2d 828, 831 n.4 (D.C. Cir. 1983) (only matters "involving trivial administrative details" protected by Exemption 2); Crooker v. ATF, 670 F.2d 1051, 1069 (D.C. Cir. 1981) (en banc), abrogated in part on other grounds, (exemption limited to "trivial administrative matters of no genuine public interest.").[2]

---

[1] The DOJ appears to argue in part that there cannot be genuine public interest in information that relates only to the internal functions of an agency, see Reply in Supp. of Mot. for Summ. J. at 8–9, but this argument surely is wrong. Rose established that Exemption 2 requires a two-part inquiry: whether the document is related solely to internal personnel rules and practices *and* is subject to no genuine public interest. 425 U.S. at 369. Under the government's proposed test, however, the second prong would be subsumed by the first and rendered meaningless.

[2] Crooker interpreted Exemption 2 to apply to both personnel records of no genuine public interest—called "low 2"—and documents that "significantly risk[ ] circumvention of agency regulations or statutes"—called "high 2." Id. The Supreme Court in Milner recently held that Exemption 2 does not protect so-called "high 2" records and that "Low 2 is all of 2[.]" 131 S. Ct. at 1265. As ATF points out, this holding has not altered earlier caselaw interpreting the "genuine public interest" test, which remains in place. See, e.g., Institute for Policy Studies v. CIA, 885 F. Supp. 2d 120, 146 (D.D.C. 2012) (applying "public interest" standard post-Milner); Brown v. FBI, 873 F. Supp. 2d 388, 400 (D.D.C. 2012) (same).

Thus, the relevant inquiry is whether the policies and procedures the DOJ uses to screen applicants for law enforcement positions is trivial personnel information.

The DOJ posits that "while the public may have an interest in knowing that applicants for a law enforcement position with ATF are subject to pre-screening polygraphs . . . the public does not have an interest in the internal practices and procedures by which that screening is conducted at ATF." Id. But this *ipse dixit* contravenes the requirement that the Court construe Exemption 2 narrowly. How government agencies use polygraphs to screen employees is not a trivial matter like the "'use of parking facilities or regulations of lunch hours, [or] statements of policy as to sick leave,'" which the Supreme Court has cited as examples of documents that can be withheld under Exemption 2. Milner 131 S. Ct. at 1262 (quoting Rose, 425 U.S. at 363). The public may well want to know, as Sack does, how agencies employ somewhat-controversial polygraph techniques to screen job applicants. Thus, construing Exemption 2 narrowly, it cannot extend to ATF's polygraph program because this is not trivial personnel information.

### ii. Exemption 5

FOIA Exemption 5 shields from disclosure "inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 522(b)(5). Exemption 5 encompasses the deliberative process privilege, which protects materials that are "'both predecisional and a part of the deliberative process.'" Nat'l Inst. of Military Justice v. DOD., 512 F.3d 677, 680 n.4 (D.C. Cir. 2008) (quoting Formaldehyde Inst. v. U.S. Dep't of Health and Human Servs., 889 F.2d 1118, 1121 (D.C. Cir. 1989)). "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news" and, thus, "its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." Dep't of Interior v. Klamath Water Users

Protective Ass'n, 532 U.S. 1, 8–9 (2001). The privilege thus protects "'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and polices are formulated.'" Id. at 8 (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975)). The privilege does not protect any "opinions and interpretations which embody the agency's effective law and policy[.]" Elec. Frontier Found. v. DOJ, 739 F.3d 1, 7 (D.C. Cir. 2014) (citing NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 153 (1975)). An agency's recommendation may remain "pre-decisional" even though it has been communicated to another agency. Trea Senior Citizens League v. Dep't of State, 10-1423, 2013 WL 5825251, at *6 (D.D.C. Oct. 30, 2013) (citing among others Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 188 (1975)).

ATF redacted a portion of the email to OMB quoting and interpreting Order 2123.1. Boucher Decl. ¶ 18. It is well established that an agency's regulations and settled regulatory interpretations are not covered by the deliberative process privilege. E.g., Elec. Frontier Found., 739 F.3d at 7 ("agencies must disclose their working law," which cannot be "hidden behind a veil of privilege because it is not designated as formal, binding, or final." (internal citations and quotation marks omitted)). At face value, then, the redacted portion of the email cannot be withheld under Exemption 5 because it provides ATF's interpretation of its regulation, and nothing indicates that this interpretation was in any way novel.

AFT explains further, however, that it sent OMB the information contained in the email to help it decide whether to re-approve Order 2123.1, and argues that these deliberations on *future* regulation make the document deliberative and pre-decisional. Boucher Decl. ¶¶ 22–23. This added wrinkle does not justify the withholding. In Public Citizen v. OMB, 598 F.3d 865 (D.C. Cir. 2009), OMB sought to withhold a document containing its interpretations of statutes and current practices under the deliberative process privilege because the document was prepared to help

11

generate recommendations for the Executive Office of the President. Id. at 867–68. The D.C. Circuit held, however, that a document explaining *existing* policy "cannot be considered deliberative" simply because it was created to help make decisions about future policies. Id. at 876. Likewise, AFT does not indicate that the inter-agency email provides recommendations on how to modify the order or whether to re-approve it. Instead, the email quoted an existing order and "provide[d] a clarifying interpretation of that provision," Boucher Decl. ¶ 18, and therefore does not "reflect the give and take of the deliberative process[.] See Public Citizen, 598 F.3d at 876. Accordingly, ATF cannot redact portions of the email under Exemption 5.

### iii. Exemption 7(E)

Exemption 7(E) applies to information compiled for law enforcement purposes to the extent release of such records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). To properly withhold records under Exemption 7(E), the agency must "establish a rational nexus between the withheld material and a legitimate law enforcement purpose[.]" Campbell v. DOJ, 164 F.3d 20, 32 (D.C. Cir. 1998). "[T]he 'ordinary understanding of law enforcement includes . . . proactive steps designed to prevent criminal activity and to maintain security.'" Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico, 740 F.3d 195, 203 (D.C. Cir. 2014) (quoting Milner, 131 S. Ct. at 1272 (Alito, J., concurring)). Where an agency "specializes in law enforcement, its decision to invoke exemption 7 is entitled to deference." Id. (citing Pratt v. Webster, 673 F.2d 408, 419 (D.C. Cir. 1982)). The required demonstration that disclosure would risk circumvention of the law is "a relatively low bar[.]" Pub. Employees for Envtl. Responsibility, 740 F.3d at 205.

The D.C. Circuit has already established that security clearance procedures used to evaluate candidates for positions in a law enforcement agency may be withheld under Exemption 7(E). Morley v. CIA, 508 F.3d 1108, 1128–29 (D.C. Cir. 2007) (citing Mittleman v. OPM, 76 F.3d 1240, 1243 (D.C. Cir. 1996)). Indeed, in Morley, the CIA was permitted to withhold information simply on the basis that it could "provide insight" into the security clearance process. Id. at 1129. Under a similarly deferential standard, this Court likewise has held that records regarding polygraphing job applicants may be withheld under Exemption 1 as classified in the interests of national defense or foreign policy. Sack v. CIA, 12-537, 2014 WL 2769103, at *3 (D.D.C. June 17, 2014); Blazy v. Tenet, 979 F. Supp. 10, 23 (D.D.C. 1997). Consistent with these cases, the Court will accord ATF a high level of deference in reviewing its determination that exposing the withheld procedures would risk circumvention of the law.

ATF has explained that releasing portions of Order 2123.1 and the email to OMB "would allow and/or assist applicants to manipulate or circumvent ATF's polygraph procedures by giving applicants insight and information regarding how test results are evaluated by the agency and the consequences of various test results or outcomes[.]" Bucher Decl. ¶ 45. Facially, this explanation meets the highly deferential standard the Court must apply under 7(E). While this standard is highly deferential, it is not unlimited. Sack points out that ATF appears to be applying this exemption in an extremely broad manner, including applying it to information as apparently benign as the fact that the Chief Security Officer in ATF is tasked with reviewing the decision to deny a security clearance because of an inconclusive polygraph examination. Opp. to Mot. for Summ. J. Ex. C. Given that the Court has determined that ATF may not withhold Order 2123.1 and the OMB email under Exemptions 2 or 5, it will defer ruling on ATF's withholdings under Exemption 7(E) in order to provide ATF an opportunity to determine whether, in light of this opinion, any portions of the withheld material are reasonably segregable from properly withheld material. In doing so, the

agency should keep in mind that there must be "a rational nexus between the withheld material and a legitimate law enforcement purpose[.]" Campbell v. DOJ, 164 F.3d at 32.

## IV. Conclusion

For the reasons stated above, the government's motion for summary judgment is denied with respect to Sack's request to the FBI for records regarding DACA/NCCA and ATF's withholding of ATF Order 2123.1 and the September 2010 email under Exemptions 2 and 5. The government's motion is granted in all other respects. The Court will issue an order consistent with this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: August 21, 2014